[Crim. No. 26960. Second Dist., Div. Four. Feb. 18, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT REYNOLDS, Defendant and Appellant.

COUNSEL

Keith C. Monroe, under appointment by the Court of Appeal, and Monroe & Riddet for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JEFFERSON (Bernard), J.**—Defendant Robert Reynolds was charged by an amended information with the following offenses: in count I, with the kidnaping of Tracy Greenfield, in violation of Penal Code section 207; in count II, with the rape of Tracy Greenfield, in violation of Penal Code section 261, subdivision 3, and in connection with this offense it was alleged that defendant inflicted great bodily injury on the victim; in count III, with the commission of a lewd and lascivious act upon the person of Tracy Greenfield, a child under the age of 14 years, in violation of Penal Code section 288; in count IV, it was alleged that defendant had forcibly orally copulated Tracy Greenfield, at a time when defendant was more than 10 years older than the victim, a 12-year-old girl.

Count V charged that defendant furnished to Tracy Greenfield a controlled substance in violation of Health and Safety Code section 11380. Count VI charged that defendant administered pentobarbital to Tracy Greenfield with the intent to cause her death, although death did not occur, in violation of Penal Code section 216; in count VII the offense charged was the commission of a lewd and lascivious act upon Diane Konoske, a child under the age of 14 years, in violation of Penal Code section 288. Counts VIII, IX, X and XI charged defendant with

furnishing a restricted dangerous drug, a barbituric acid derivative, to Diane, Donna, Cynthia and Paula Konoske, respectively, in violation of Health and Safety Code section 11913. (See, now, § 11380.)

Five prior convictions were alleged.

Defendant entered a plea of not guilty and denied the priors. His motion to dismiss (Pen. Code, § 995) was granted in part and denied in part; his motion to suppress (Pen. Code, § 1538.5) was heard, argued and denied. Thereafter defendant waived jury trial, withdrew his plea of not guilty to counts VII and XI, and entered a plea of guilty to those counts. Defendant was sentenced to state prison for the term prescribed by law, the sentences to run concurrently, and was given credit for 520 days already served.

Defendant appeals from the judgment of conviction.

The sole issue before us on this appeal is the validity of the trial court's ruling denying defendant's motion to suppress evidence. Penal Code section 1538.5, subdivision (m) provides that "[a] defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that such judgment of conviction is predicated upon a plea of guilty. Such review on appeal may be obtained by the defendant providing that at some stage of the proceedings prior to conviction he has moved for the return of property or the suppression of the evidence."

The standard of review applicable herein has been described by the California Supreme Court as follows: "A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

In *People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621], the court enlarged the "substantial evidence" standard of review when it stated: "The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the

meaning of the Constitution. Although that issue is a question of law, the trial court's conclusion on the point should not lightly be challenged by appeal or by petition for extraordinary writ. [Fn. omitted.] Of course, if such review is nevertheless sought, it becomes the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness."

In the case at bench, defendant challenged at the suppression hearing five searches and seizures by the police at his residence, purportedly conducted with the consent of defendant's wife. Since California retains the "vicarious exclusionary rule," (*People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1]) with respect to Fourth Amendment rights, such a challenge could properly be undertaken.

Evidence adduced at the hearing below revealed that on August 23, 1973, 12-year-old Tracy Greenfield was kidnaped by a person described to the police as a male Caucasian of indeterminate age, slightly built, five feet ten inches tall, with black and grey hair, and that he wore "Benjamin Franklin" type eyeglasses with half lens frames. Tracy told the police that her abductor had a mustache and had been driving a blue Buick station wagon with black wall tires; that in the car there was blue and white shag carpeting on the rear floorboard, and that there was a blue blanket or towel on the front seat. Tracy further stated to the police that there were holes in the rear of the vehicle where speakers had once been attached; that the suspect carried a brown briefcase with a combination lock, and used red and black marking pens to write on a paper tablet during the criminal activity; that he also drank from a bottle which was in a brown paper sack. According to Tracy, the suspect forced her to take some yellow capsules with a can of cola, and she became groggy; he gave her pornography to read, and at one point stopped the car to make a telephone call and she heard him say: "I have got the girl"; later, she was transferred to another vehicle. She also told the authorities that the suspect displayed a pocket knife and that she was released by the kidnaper after she had been sexually molested and while she was still feeling the effects of the narcotic substance which had been given her.

There was considerable publicity concerning the Greenfield crime, and the media reports included a description of the suspect and of the vehicle used at the inception of the crime.

On August 26, 1973, a teenager named Cynthia Konoske informed the police that the description of the kidnaper and his vehicle closely matched that of her stepfather, the defendant, and his 1963 blue Buick station wagon. Cynthia included in her description some details not publicized, which matched those provided by Tracy Greenfield and her younger brother Jerry, who had been present at the abduction scene. Cynthia appeared to the police to be frightened. She told them defendant had administered drugs to her and had sexually molested her sisters. She also said that defendant had drastically changed his appearance in the last few days by cutting his hair very short, shaving off his mustache and pulling his teeth. The police commenced an investigation of defendant in their records.

On August 26, 1973, about 5:30 p.m., Police Officers Campbell and Kijula commenced surveillance of defendant's residence, located at 7919 Sausalito. At about 7 p.m., accompanied by Police Officers Moody and Higgins, they approached the house. The police had formed a plan whereby Officers Campbell and Kijula would take defendant to the Van Nuys police station for questioning while the other two officers stayed behind at the house to interview the Konoske girls about defendant's activities.

Defendant opened the door of the residence when the officers knocked, and invited them into the house. The officers told him that they were investigating the Greenfield kidnaping. Apparently, defendant was not surprised by the police visit; his wife testified that they had discussed the Greenfield crime and the fact that they owned a vehicle similar to that described, and that as a result, there was a possibility of contact with the police.

Defendant led Officers Campbell and Kijula to his den, where they asked him to accompany them to the police station. He agreed, and after putting on his coat and shoes, left the house with the officers. While the evidence on this point is in conflict, it appears that before he left he spoke briefly to his wife, telling her where he was going. In the car, he asked the officers if he was under arrest, and was told that he was not. He mentioned several times his willingness to cooperate in the investigation on his way to the police station where he arrived about 7:30 p.m. He was then advised of his rights with respect to custodial interrogation. Defendant stated he would remain silent, but would appear in a lineup.

Officers Moody and Higgins remained at defendant's residence. Officer Moody was conversing with defendant's wife as defendant was leaving the house. He testified that at the time defendant was leaving, he had already broached the subject of search to defendant's wife, telling her of the Greenfield investigation. "During the conversation I asked Mrs. Reynolds if she would permit us to look around the house and she asked for what were we looking and we—or I said, 'Any evidential material we might find that would relate to the investigation we are conducting.'" According to Moody, Mrs. Reynolds seemed very calm, and stated that her husband had certainly not done anything, nor had she, and that "we were at liberty to look at anything we liked." There was discussion of defendant's blue Buick which had been sold very recently. After defendant had left, the remaining officers interviewed the Konoske children, which upset Mrs. Reynolds. However, she interposed no objection.

After about 30 minutes, Officer Higgins, accompanied by Cynthia Konoske, started searching in defendant's bedroom for pictures of defendant as he had looked prior to the recent changes made in his appearance. Officer Higgins testified that at this time he advised Mrs. Reynolds that she did not have to consent to the search, but that she not only consented but helped him locate the pictures in question, in a dresser drawer; that she also directed him to the garage area, where defendant had a desk and kept his business papers, as well as photographic equipment and a darkroom. During this preliminary search, "mini-bennies" were discovered, as well as an empty vodka bottle in a brown bag, and marking pens.

During the time the officers remained at defendant's home there were several telephone conversations between them and the police at the Van Nuys police station. As part of these telephone conversations, the searching officers were told that a deputy district attorney had advised that the search, consented to by Mrs. Reynolds, was lawful; and they in turn advised the officers at the station of what they had learned from the Konoske girls concerning defendant's conduct with them. It was determined that defendant should be arrested, and at about 8 p.m., he was.[1] The police also decided that Mrs. Reynolds and the Konoske children should be taken to the Van Nuys police station for further interrogation.

[1] Defendant caused the police report to be admitted in evidence at the hearing; it showed the place of arrest as Sausalito and the time 7 p.m. One officer who testified termed the report a mistake.

Mrs. Reynolds and the children were separated when they arrived at the station. Officer Higgins advised Mrs. Reynolds that some of her girls had accused defendant of sexual molestation, and that the children were to be detained. Mrs. Reynolds cried and said: "Please, don't take my children." According to Higgins, she was very upset.

Sometime between 1:30 a.m. and 2:30 a.m., Mrs. Reynolds returned home with Officer Higgins, and found other police there with her oldest girl, Donna, who was not a minor and had not been detained. Higgins testified that Mrs. Reynolds reiterated her willingness that the police search the premises and offered to help in any way she could. She testified that at that time she was feeling "dead" because the children had been taken away. A complete search of the house and garage ensued, during which a brown briefcase with a distinctive lock, similar to that described by the Greenfields, was discovered.

The police and Mrs. Reynolds discussed the darkroom in the garage, which was padlocked. Mrs. Reynolds directed the officers to some keys in defendant's bedroom; one of them opened the darkroom lock. She had explained to the officers that the darkroom was kept locked by defendant to prevent the door from being opened while photographs were being processed, and because there were chemicals in use there. When the officers searched this room they discovered pornographic negatives and photographs, some of which depicted the Konoske girls.

On August 28, petitions were filed in juvenile court pursuant to Welfare and Institutions Code section 600 to have each of the five minor Konoske children declared a dependent child of the court. On that evening, at about 10 p.m., police officers returned to defendant's residence to search some more. More photographs were found which were pornographic, including some in a box in the garage labeled "Dean's papers." After this search, the police officers and Mrs. Reynolds, who again had given her consent, discussed defendant's expertise in the field of search and seizure law. The officers then drafted a written consent to search which Mrs. Reynolds signed. In this written consent, Mrs. Reynolds stated that her permission to search had been obtained freely, without duress, and "without threats" to her or to her children.

Mrs. Reynolds herself testified at the hearing that she had given her consent to the searches free of coercion; that her husband had informed her some months earlier not to consent to a search of the residence, but that she did not tell the police this. She also testified that while she was at

the police station she had been treated courteously, and not harassed; that when the children were removed she had been upset but did not object to subsequent searches conducted while the children were in custody or after their release.

The Konoske children were released on August 29, after the detention hearing. On September 14, the district attorney requested in juvenile court that the petitions be dismissed because the allegations could not be proved. On August 30, and again on September 4, the police returned to defendant's residence and searched for additional evidence, each time securing Mrs. Reynolds' consent in advance. On the visit of September 4, a second box of "Dean's papers" was found. This was a box which contained additional pornographic material. In all, the five searches produced such incriminating items as eyeglasses similar to those worn by the Greenfield kidnaper, the similar briefcase, the empty vodka bottle, pills, marking pens, and the pornographic photographs and negatives. At no time during the period from August 26 to September 4, or thereafter, did the police obtain either a search warrant or defendant's consent to the searches that were conducted.

On this appeal, defendant contends that from the very beginning of the police investigation, the officers involved had formulated a plan, due to their suspicions of defendant and their lack of concrete evidence, to remove defendant from the house and secure permission to search, if possible, from defendant's wife, without following preferable constitutional alternatives, i.e., requesting permission to search from defendant or obtaining a search warrant. Defendant maintains that there was no basis for issuing a search warrant; that he was illegally arrested, and that his wife's consent was coerced because it was obtained by deception on the part of the police.

■ In *People* v. *Strawder* (1973) 34 Cal.App.3d 370, 376-377 [108 Cal.Rptr. 901], the court summarized the applicable law: "We observe, preliminarily, that a search preceded by a voluntary, freely given consent is a reasonable and permissible search under constitutional standards. [Citations.] The consent must be voluntary and not in response to an express or implied assertion of authority. [Citations.] Whether a consent to search was freely and voluntarily given or was rather merely a nonvoluntary submission to an express or implied authority, is a question of fact resolvable upon reference to all the attendant circumstances. [Citations.] The burden, in each instance, is upon the government officials to show by clear and positive evidence that the consent was freely, voluntarily and knowledgeably given. [Citations.]" .

Although it is clear that the prosecution has the burden of proving that a warrantless search is valid, it is not so clear as to whether this burden of proof is satisfied by a preponderance of the evidence or whether the burden of proof must be sustained by clear and convincing proof, one of the burden-of-proof standards set forth in Evidence Code section 115. In *People v. Superior Court (Bowman)* (1971) 18 Cal.App.3d 316 [95 Cal.Rptr. 757], the court held that reasonable cause to make an arrest and search without a warrant could be established by a preponderance of the evidence.

But a month after *Bowman,* in *Blair v. Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], the California Supreme Court used the language found in *Strawder:* "Where government officials rely on consent to justify the lawfulness of a search, the burden is on them to show by *clear and positive evidence* that the consent was freely, voluntarily and knowledgeably given. [Citations.]" (Italics supplied.)

■ What burden-of-proof standard is meant by the phrase—"clear and positive evidence"? Although we find no attempt to define this phrase further, it seems clear to us that "clear and positive evidence" means *more* than a preponderance of the evidence.

We thus hold that the prosecution's burden of proof on the issue of justification for a warrantless search, whether by proof of reasonable cause or proof of consent, requires proof by the *clear-and-convincing-proof* burden-of-proof standard. With no contrary indication in the record, we must assume that the trial judge applied the appropriate burden-of-proof standard in reaching his decision.

The question involved here is the validity of a warrantless search of a residence occupied by husband and wife and made as a result of a consent by the wife. Since there was no consent by defendant for the search of the residence, the validity of the search depends upon whether, under the circumstances presented, the wife of defendant had the *authority* to consent to the search. The rule is well established that authority to consent to a search of premises or property by a person other than the defendant may be shown by various circumstances. One circumstance relates to the situation with respect to cotenants, co-possessors, cocontrollers of property, or those with co-access to property.

■ With respect to cotenants, copossessors, or cocontrollers of property, it is established law that a cotenant, copossessor, or cocontroller, while in actual possession or control of premises, has, by virtue of such possession or control, *authority* to give a consent to the police to search the premises if the defendant, who is the cotenant, copossessor, or cocontroller, is not present and has given the police no overt indication of an objection to the search. ■ This rule was stated by *People* v. *Hill* (1968) 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521] as follows: "[A] search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search . . . ." This doctrine of "authority" was reaffirmed in *People* v. *McGrew* (1969), 1 Cal.3d 404, 412 [82 Cal.Rptr. 473, 462 P.2d 1], in which the court added: "The operative word in the rule is 'reasonably;' thus, there must be some objective evidence of joint control or access to the places or items to be searched which would indicate that the person *authorizing* the search *has the authority* to do so. [Citations.]" (Italics supplied.)

This rule of the authority of a co-occupant to give a consent to search is based upon the actual control which a co-occupant has over premises that are jointly occupied. However, the right of control of one co-occupant over jointly occupied property which constitutes an actual authority over such property, including the authority to give the police a consent to search the premises without the concurrence of other co-occupants, is not absolute. "A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession. [Citations.]" (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 69 [27 Cal.Rptr. 889, 378 P.2d 113].) *Tompkins* also tells us that "[j]oint occupancy of property, particularly residential property, obviously demands reasonable restrictions on the right of each joint occupant either by himself or through another to exercise full control over the property at all times regardless of the wishes of another joint occupant present on the premises." (*Tompkins, supra,* 59 Cal.2d at p. 69.)

The restrictions and limitations imposed by the courts upon a co-occupant's exercise of authority over the premises in giving permission to the police to search the premises without concurrent consent by other co-occupants, have been delineated in several situations. If a co-occupant is absent from the premises, he is denied the authority to give the police a consent to search which is contrary to the wishes of the cotenant who is present on the premises at the time the police seek to make a search. This restriction on the authority of the *absent* cotenant is

found in several cases: *Duke* v. *Superior Court* (1969) 1 Cal.3d 314 [82 Cal.Rptr. 348, 461 P.2d 628] (absent spouse [wife] not permitted to waive the right to privacy of her husband then occupying the premises); *People* v. *Shelton* (1964) 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665] (joint tenant immediately outside an apartment with the police not permitted to authorize search of the apartment contrary to the wishes of the cotenant inside the apartment); *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65 [27 Cal.Rptr. 889, 378 P.2d 113] (cotenant away from the premises held · not authorized to give the police consent to search contrary to objections by cotenant present on the premises when police arrive).

In light of the legally imposed restrictions on the authority of one co-occupier to give a consent to search of premises, it follows that if both occupiers are present when the police seek a consent to search, a consent by one will be deemed valid so long as the other made no objection. On the other hand, if two cotenants are present, such as husband and wife, and one gives the police permission to search and the other refuses, it would appear reasonable to hold that the nonconsenting co-occupant's right to privacy should prevail to preclude a valid search. But in *Russi* v. *Superior Court* (1973) 33 Cal.App.3d 160 [108 Cal.Rptr. 716], we have the situation of a cotenant who was a probationer and, as a condition of probation, had given a consent to search. The probationer cotenant was occupying premises jointly with petitioner. The *Russi* court held that petitioner, even though present, could not invalidate the probationer's consent to search.

Another restriction against the authority of a co-occupier to give the police a consent to search the premises while such co-occupier is present is found in the principle that the co-occupier present on the premises has no authority to give a valid consent to search if the police have been advised that the absent co-occupier does not consent to such a search. This was the situation in *People* v. *Fry* (1969) 271 Cal.App.2d 350 [76 Cal.Rptr. 718], where the warrantless search of a residence was held to be constitutionally invalid because the wife of the defendant present on the premises advised the police prior to the search that her husband had told her not to consent to a search. The *Fry* court held that even though the wife was a cotenant of the premises, she had no authority to consent to an invasion of the right of privacy on the part of her husband, also a cotenant, and that, with the knowledge on the part of the police officers of the husband's lack of consent, the officers could not have "reasonably and in good faith" believed that the wife had authority to consent to the search.

Although *Fry* makes clear that a lack of consent to search by an absent defendant who is a co-occupant of premises is of significance if communicated to the police, the courts have not imposed upon the police any duty to seek to find out the attitude of the absent cotenant defendant. That this is the accepted rule of law is evidenced by the fact that we find no statement imposing any such duty upon the police in cases such as the *McGrew* and *Hill* cases, *supra*. In *People* v. *Linke* (1968) 265 Cal.App.2d 297 [71 Cal.Rptr. 371], defendant was present on the premises jointly occupied by him, his wife and another cotenant. The wife and the other cotenant gave consent to the search. The search was held valid. No attempt was made by the police to determine whether defendant objected or not.

Defendant's reliance on *People* v. *Fry, supra,* is not well taken. In *Fry*, as pointed out above, the warrantless search of a residence was found constitutionally invalid because the wife of the defendant had advised the police prior to the search that her husband had told her not to consent to a search. The *Fry* court concluded, therefore, that the police officers could *not* have reasonably entertained a good faith belief that she had the authority to consent. ■ In the instant case, defendant argues that the police deliberately avoided seeking his consent, hoping that his wife would give it. Assuming this to be true, the wife's consent is not thereby rendered invalid. The record here indicates that Mrs. Reynolds never told the police of defendant's attitude toward search of the residence and, considering defendant's expressed intention to cooperate with the police investigation, there is clear justification for finding that Mrs. Reynolds was authorized to permit search by the police. *Fry,* therefore, is clearly distinguishable from the case at bench.

The "attendant circumstances" of the first search of defendant's residence are reviewed here, as they must be, with all the inferences that can be reasonably and favorably made to support the trial court's holding that defendant's wife consented to the search freely and voluntarily, and with the authority to do so. We gather from the record that the husband and wife anticipated some sort of a police investigation because of their ownership of the Buick station wagon, and that Mrs. Reynolds felt there was nothing to fear by allowing the search. The police officers involved on the first occasion were actually conducting a dual investigation—of the Greenfield matter and also of Cynthia Konoske's charges against defendant. It appears that Mrs. Reynolds did not know that Cynthia had been to the police station to tell the police about defendant.

From the information known to the police at the time they arrived at defendant's residence, it appears that they had probable cause to arrest defendant either there or at the police station. There is undisputed evidence that defendant accompanied the police voluntarily away from the premises. The search was not constitutionally defective simply because the officers did not share with defendant or his wife their investigative plan. The crucial issue is whether, taking into account the total circumstances, Mrs. Reynolds' consent for a search of premises over which she exercised equal control with defendant was obtained by coercion or imposition of authority, or, was given freely and without fear. The record supports the ruling made, that her consent was voluntarily given, even after she was informed that she need not permit a search of the residence. While her consent may have been predicated on her belief in defendant's innocence rather than guilt, it was still freely given.

Defendant contends that there is even stronger support for the conclusion that the search, conducted in the early morning hours of August 27 after the children had been removed from the custody of their mother, was the result of coercion as a matter of law. Defendant's wife had already shown herself cooperative with the police. There is no doubt that her motivation in this regard intensified after the children were taken. The police, however, had sufficient information to justify detaining the children. Cynthia had expressed fear of defendant. More than one reasonable inference may be made concerning the police conduct. The conclusion that the detention was arranged to force further search of the residence with the consent of Mrs. Reynolds is not compelled, particularly in light of the fact that she had previously given a free and voluntary consent to search. Her distraught state on August 27 was not necessarily the result of, or the forerunner of, unconstitutional coercion but appears to have been more closely related to the information given her by the police about defendant's activities.

We conclude, as did the trial court, that the searches met the constitutional standard of reasonableness under all of the circumstances.

Defendant seeks to persuade us that his wife had no authority to consent to the search of the darkroom—and of the boxes in the garage bearing another person's name—because the search was conducted in areas and of items which were not subject to her joint control with defendant. In *Beach v. Superior Court* (1970) 11 Cal.App.3d 1032, 1035 [90 Cal.Rptr. 200], it was held that a constitutionally permissible search,

based on consent by a co-occupant, was limited to "common areas of control" shared by joint occupants of residential premises.

We note briefly two federal cases which defendant was allowed to submit after oral argument, and upon which he relies with respect to the darkroom search. In *United States* v. *Matlock* (1974) 415 U.S. 164 [39 L.Ed.2d 242, 94 S.Ct. 988], a majority of the Supreme Court held that consent to search could be given by a person exercising common authority over premises or effects; footnote 7, at page 171 [39 L.Ed.2d at page 250], referred to by defendant, merely states that common authority is not based on a common property interest in the legal sense but on joint access to the property in question. In *United States* v. *Heisman* (8th Cir. 1974) 503 F.2d 1284, consent to search had been given by a cotenant of defendant; the area searched was not one to which the cotenant had joint access, and thus the search was held invalid. In our view, neither of these decisions is inconsistent with our holding herein.

The evidence adduced below concerning the garage and darkroom established that it was defendant's work area, occasionally used by other family members and somewhat restricted because of the type of activity (photography) conducted there. This type of arrangement is not uncommon in a family home, but does not lead to the conclusion, as between a husband and wife, that such areas are beyond either spouse's control. The other cases previously cited by defendant involve the scope of search incident to arrest, or what is permissible when consent is given by the possessor of premises under other circumstances, and are not applicable to the case at bench.

In view of our conclusion that all of the searches were constitutionally reasonable and permissible, it is unnecessary to consider the issue of subsequent searches as "tainted" by previous illegality.

The judgment appealed from is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied March 8, 1976, and appellant's petition for a hearing by the Supreme Court was denied April 15, 1976.