[Crim. No. 35977. Second Dist., Div. One. May 7, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON LAWRENCE ENGEL, Defendant and Appellant.

COUNSEL

Jerry D. Whatley for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman and Carol Slater Frederick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**JEFFERSON (Bernard), P. J.**—By information, defendant Jason Engel and codefendant Anita Colling were charged in count I with possession of cocaine, a violation of Health and Safety Code section 11350. In

count II defendant was charged with possession of cocaine for sale, a violation of Health and Safety Code section 11351. In count III, defendant and Colling were charged with possession of lysergic acid diethylamide, a violation of Health and Safety Code section 11377.

In count IV, defendant and Colling were charged with possession of methaqualone, a violation of Health and Safety Code section 11377. In count V, defendant and Colling were charged with possession of blank prescription forms, a violation of Health and Safety Code section 11161. In count VI, defendant and Colling were charged with possession of a hypodermic needle and syringe, a violation of Business and Professions Code section 4143. In count VII, defendant and Colling were charged with possession of paraphernalia used for injecting a controlled substance, a violation of Health and Safety Code section 11364. Defendant entered a plea of not guilty to all counts.

Defendant's motion to suppress evidence, made pursuant to Penal Code section 1538.5, was submitted to the trial court on the transcript of the preliminary examination. The motion was denied without prejudice. Defendant renewed the motion, which was denied.

Defendant was thereafter advised of and waived his constitutional rights; he entered a plea of nolo contendere to a violation of Health and Safety Code section 11357, subdivision (a), possession of concentrated cannabis, and was given a misdemeanor sentence. Counsel stipulated that this violation was a reasonably related offense to that charged in count II of the information. Defendant was sentenced to one year in the county jail. This sentence was suspended for three years on unsupervised probation; in addition, defendant was given a $150 fine. Defendant was released on summary probation. He has taken this appeal from the order granting probation.

I

*The Propriety of the Appeal*

At the outset, the People contend that defendant is precluded from pursuing this appeal because he failed to comply with rule 31(d) of the California Rules of Court, in that his notice of appeal did not specify that the appeal was taken after his nolo contendere plea to challenge the trial court's denial of his suppression-of-evidence motion.

It is true that defendant's appeal notice merely stated that the appeal was taken from the order granting probation. The Penal Code section governing appeals after convictions arising from pleas is section 1237.5. This section provides: "No appeal shall be taken by defendant from a judgment of conviction upon a plea of guilty or nolo contendere, or a revocation of probation following an admission of violation, except where: [¶] (a) The defendant has filed with the trial court a written statement, executed under oath or penalty of perjury showing reasonable constitutional, jurisdictional, or other grounds going to the legality of the proceedings; and [¶] (b) The trial court has executed and filed a certificate of probable cause for such appeal with the county clerk."

As may be seen, section 1237.5 does not specify any exceptions to its application. But exceptions have been made and they have been fashioned by judicial decision and have been incorporated in rule 31(d) of the California Rules of Court. Rule 31(d) provides: "If the appeal from a judgment of conviction entered upon a plea of guilty or nolo contendere is based solely upon grounds (1) occurring after entry of such plea which do not challenge the validity of the plea or (2) involving a search or seizure, the validity of which was contested pursuant to section 1538.5 of the Penal Code, the provisions of section 1237.5 of the Penal Code requiring a statement by the defendant and a certificate of probable cause by the trial court are inapplicable, *but the appeal shall not be operative unless the notice of appeal states that it is based upon such grounds . . . .*" (Italics added.)

In *People* v. *Kaanehe* (1977) 19 Cal.3d 1 [136 Cal.Rptr. 409, 559 P.2d 1028], the California Supreme Court declined to penalize a defendant who had not complied with Penal Code section 1237.5, with respect to a search and seizure issue presented on appeal. The *Kaanehe* court stated that "section 1538.5, subdivision (m), which provides that search and seizure issues may be raised on appeal after a plea of guilty, constitutes an exception to section 1237.5." (*Id.,* at p. 8.) The court explained that "section 1237.5 does not affect the grounds upon which appeal may be taken following a guilty plea; it merely establishes a *procedure* for screening out frivolous claims among these issues which have not been waived." (*Id.* at p. 9.) (Italics added.)

In similar fashion, rule 31(d) of the California Rules of Court has added the requirement that defendant's notice of appeal specify the grounds of appeal in order to screen out frivolous claims and also to put the People on notice as to the basis of the appeal. ■ In our view, de-

fendant's failure to comply with this requirement is not jurisdictional and hence does not preclude our consideration of the merits of defendant's appeal. In the instant case, defendant's opening brief was directed solely toward the search and seizure issue; we perceive no prejudice to the People as the result of the defective notice of appeal, and the People claim none. As in *Kaanehe*, we proceed to review the case on the merits.

Our review is predicated on the following standard. ▇ First of all, a suppression-of-evidence hearing involving a warrantless search and seizure imposes a burden of proof on the People to establish justification under a recognized exception to the warrant requirement. (*People v. James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) ▇ Secondly, "[a] proceeding under section 1538.5 [of the Penal Code] to suppress evidence is a full hearing on the issues before the superior court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People v. Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) With these considerations in mind, we summarize the facts adduced at the suppression hearing.

## II

### *Facts Adduced at the Suppression-of-evidence Hearing*

Pamela Russo, aged 22, shared a townhouse in Goleta, California with two other young people, defendant Engel and Anita Colling, during 1978. Pamela had signed the lease for the premises and had paid the first and last month rent. The lease had expired in August 1978, and, from that time on, the tenancy had proceeded on a month to month basis. There was also testimony that the utilities and the telephone at the Goleta address were in Pamela's name. The townhouse was in essence an apartment on two floors, joined on either side by similar type buildings. Pamela shared an upstairs bedroom with defendant Engel, and Anita occupied another upstairs bedroom.

Toward the end of 1978, Pamela and defendant were not getting along and, at one point, Pamela had complained about defendant to the Santa Barbara Sheriff's Department. Sometime before January 13, 1979,[1] Pamela left the Goleta premises.

On January 13, 1979, Pamela, accompanied by her parents, the Russos, went to the sheriff's department and talked to two deputies, Spinner and Gregg. The Russos requested protection for their daughter while she removed her clothing and personal effects from the town-house. Pamela advised the officers concerning her occupancy there and declared she was afraid that defendant would harm her if she went to the townhouse without the officers.

Acting upon the instructions of their sergeant, Spinner and Gregg agreed to accompany the Russos to the Goleta premises for the purpose of "keeping the peace." The officers were aware of Pamela's previous complaint about defendant.

The officers and the Russos arrived at the townhouse. Pamela attempted to enter, using her key, but could not open the door. One of the officers tried the key without success. Investigation revealed that all windows and doors were secured. Pamela attempted to locate the landlord, but did not find him.

After about 25 minutes, Anita Colling drove up and parked in the nearby carport, accompanied by another woman. Pamela demanded that Anita open the front door. Anita, obviously chagrined by the presence of the officers, did not comply; she repeatedly asked Pamela if she was serious in making the request. Spinner and Gregg heard the conversation but did not intervene. Anita told Pamela that the latter's belongings had been removed from the house to the garage. Pamela, who had the correct key for the garage, opened it and ascertained that some but not all of her things were there. She returned and again demanded entry into the house. Anita then produced a key, but it would not open the door. At this point, Deputy Spinner told Anita to give Pamela the proper key so that the matter could be concluded. Anita did so.

---

[1]The record is unclear as to how long before this date Pamela had actually departed; there is reference to three days, a week, and three weeks.

All of the Russos, Anita and the officers entered the premises. At no time while awaiting entry had the officers detected any sign that anyone was within, and defendant's automobile was nowhere to be seen. However, the officers walked through the downstairs rooms to see if defendant was present. Defendant was wanted at this time on a traffic warrant involving payment of a $65 fine; the officers had indicated that they planned to take him into custody if they found him.

Anita Colling asked the officers to wait in the living room while Pamela got her things. Spinner and Gregg asked Pamela if she wished them to accompany her upstairs; she said she did as she was still afraid. Pamela, Anita and the officers then went upstairs.

Pamela and Deputy Spinner entered what was referred to at the suppression-of-evidence hearing as a "common den," an upstairs room apparently used by all of the occupants; Spinner noticed two sets of scales there, and formed the suspicion that there might be narcotics in the house; he advised Gregg of this.

Deputy Gregg asked Pamela for her consent to search that portion of the premises under her control. She said she did not care and that he could search; that she had nothing to hide. Gregg informed Spinner of this consent.

Anita Colling then closed the doors to two rooms, indicating that they were her bedroom and bathroom which she did not want searched. She also started to close the doors of a larger bedroom, but Pamela told Gregg that that was the bedroom she shared with defendant; Gregg then directed Anita to leave those doors open, and she did so.

While Spinner and Pamela were in the den, Spinner asked Pamela if any of the objects on the desk there belonged to her. Included among the objects was a large brown carved wooden box. Pamela had replied that none of these objects belonged to her. Spinner exited the room but, when he returned several minutes later, he noticed that the large box was no longer on the desk, and had been placed by Pamela in a packing container. Spinner picked up the box and asked Pamela if he could open it; she consented, and, within the box, Spinner found narcotics paraphernalia, known as a cocaine kit. Spinner then detained Pamela.

Meanwhile, Deputy Gregg had seen Anita attempt to hide some marijuana in Pamela and defendant's bedroom. He thereupon detained

Anita. Gregg advised Spinner that he had also located a cocaine kit in that bedroom. Both Gregg and Spinner commenced a detailed search of that room. Spinner found another brown wooden box—a smaller box —which contained seven vials of suspected cocaine. The box had been concealed under a wicker trash basket turned upside down.

The deputies phoned narcotics officers to assist them in their investigation; eventually a warrant was obtained. Further search of the premises turned up some LSD in the refrigerator, various pills and blank prescription forms, and written records suggesting dealings in narcotics. The suppression-of-evidence motion was directed toward all of the evidence seized on the premises.

### III

#### *The Validity of the Entry Into the Townhouse*

The main thrust of defendant's appeal is based on the contention that the warrantless entry and search of the shared Goleta premises was illegal because it was accomplished in the face of co-occupant Anita's objections; hence, defendant's motion to suppress the items of contraband found there by the officers should have been granted.

Defendant relies upon language contained in *People* v. *Reynolds* (1976) 55 Cal.App.3d 357, 369 [127 Cal.Rptr. 561],[2] declaring that "if both occupiers are present when the police seek a consent to search, a consent by one will be deemed valid so long as the other made no objection. *On the other hand, if two cotenants are present, such as husband and wife, and one gives the police permission to search and the other refuses, it would appear reasonable to hold that the non-consenting co-occupant's right to privacy should prevail to preclude a valid search.*" (Italics added.)

Placing defendant's contention in proper perspective, it rests upon the constitutional guarantees contained in the Fourth Amendment to the United States Constitution and in article I, section 13, of the California Constitution—guarantees which afford protection from unreasonable searches and seizures. ▪ While a warrantless entry, search and sei-

---

[2]Overruled on another point in *People* v. *James, supra*, 19 Cal.3d 99, 106, footnote 4.

zure are subjected to strict scrutiny, one of the well established justifications for such conduct lies in the area of consent; a police officer's conduct may be justified on the ground that he acted with the acquiescence of the parties involved. Whether in fact such consent was given and in what context depends upon all of the surrounding circumstances, and is within the province of the trier of fact. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218 [36 L.Ed.2d 854, 93 S.Ct. 2041]; *People* v. *Leib* (1976) 16 Cal.3d 869 [129 Cal.Rptr. 433, 548 P.2d 1105].)

In determining the legality of the initial entry in the case at bench, we draw certain inferences from the record. First, it appears that Pamela's status as a co-occupant of the premises had been sufficiently established insofar as the officers were concerned. The key to measurement of their conduct is whether it was reasonable, based upon their state of knowledge. Pamela had advised Gregg and Spinner that, although she had left the premises some time earlier, she had paid the rent for a time period which would have entitled her to continue her occupancy, had she desired to do so, as of January 13, 1979. It was also known to them that she had complained of defendant's conduct previously.

The second inference relates to Anita's lack of consent. The People contend that since at no time did Anita directly express to the deputies her unwillingness to consent to entry and search of the townhouse, such unwillingness should not be presumed. We disagree. The officers testified that they were well aware of Anita's attitude toward their visit. It was uncontroverted that Anita only yielded the key to the front door *after* Deputy Spinner had directed her to do so—a submission to apparent authority, and a negation of consent. (*People* v. *Shelton* (1964) 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665].)

The situation presented is that of two unrelated co-occupants of equal standing, both present at the scene, who disagreed on giving consent to entry and search. Our attention has not been called to any judicial decision directly in point. Much of the case law determining the validity of consents given by various co-occupants—spouses, girl friends, boy friends and others—has rested either on the apparent authority of a present co-occupant to give consent, or the apparent control over the premises exercised by the individual consenting, whether present or not. The results have been divergent on occasion. (See Witkin, Cal. Evidence (2d ed. 1966) § 87, pp. 81-82; *People* v. *Smith* (1966) 63 Cal.2d 779 [48

Cal.Rptr. 382, 409 P.2d 222].) In *Reynolds, supra,* relied upon by defendant, the court upheld as valid the consent to search given by the defendant's wife, who was present on the premises while the defendant was in custody, on the theory that it was reasonable for the police to rely on her apparent authority and control of the premises. (See also, *People* v. *Carter* (1957) 48 Cal.2d 737, 746 [312 P.2d 665].)

Two California Supreme Court cases, which have never been overruled, adhere to the principle that an absent co-occupant cannot, in the face of objection by a present co-occupant, confer valid consent for entry and search; they are *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65 [27 Cal.Rptr. 889, 378 P.2d 113], and *People* v. *Shelton* (1964) 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665]. Some of the language of *Tompkins* dealt with the co-occupancy dilemma: "In other contexts it has been held that one joint tenant or cotenant is entitled to possession of the entire premises and may by lease or license transfer his right of possession to another or authorize another to exercise it. [Citations.] That rule, however, is necessarily limited by the principle that 'Neither a joint tenant nor a tenant in common can do any act to the prejudice of his cotenants in their estate.' [Citations.] Joint occupancy of property, particularly residential property, obviously demands reasonable restrictions on the right of each joint occupant either by himself or through another to exercise full control over the property at all times regardless of the wishes of another joint occupant present on the premises. A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession." (*Tompkins, supra,* 59 Cal.2d 65, 68-69.)

This discussion in *Tompkins* was relied upon in *Reynolds* as supportive of the view that entry and search in the face of the unwillingness of a present co-occupant would not be valid. But one necessary exception to this principle may be found in such cases as *Russi* v. *Superior Court* (1973) 33 Cal.App.3d 160 [108 Cal.Rptr. 716] and *People* v. *Icenogle* (1977) 71 Cal.App.3d 576 [139 Cal.Rptr. 637], upholding, as valid, searches conducted pursuant to a condition in a grant of probation even where a present co-occupant had not agreed to the entry and search.

◼ In the case at bench, we think it reasonable to fashion an exception to the rule expressed in *Reynolds* based upon the fact that officers Spinner and Gregg were instructed to undertake a "keep the peace" mission, the protection of a co-occupant who feared for her personal safety on the premises. Under the circumstances presented, their entry

into the premises was justified. It was explained in *Batts* v. *Superior Court* (1972) 23 Cal.App.3d 435, 438 [100 Cal.Rptr. 181], that "[i]nnumerable contacts between police and citizens are intrusions into the citizen's privacy but these contacts have nothing to do with suspicion of criminal activity. They arise from the police officer's duty to maintain peace and security, to protect citizens from harm or annoyance and to do all those innumerable miscellaneous tasks which society calls upon the police to do which have nothing to do with the detection of crime."

In the instant case, the officers had no reason to entertain any suspicion of criminal activity in the first instance, but they were acting reasonably in attempting to preclude any such activity. We hold, therefore, that the objection by co-occupant Anita could be disregarded by the officers without placing Anita "completely at the mercy of another with whom [she] shares legal possession" (*Tompkins, supra*) of the jointly occupied premises. Given the consent of Pamela, the officers could legally enter the Goleta premises with her.

### IV

### *The Search in the Den*

In our view, Pamela's consent "extended only to the premises and their contents over which she had some possessory right or control." (*Beach* v. *Superior Court* (1970) 11 Cal.App.3d 1032, 1035 [90 Cal.Rptr. 200].) The same considerations that justified entry by the officers into the downstairs portion of the premises governed their accompanying Pamela to the second floor of the townhouse for the purpose of offering her protection in those areas of the premises where she exercised sufficient possessory right or control—the "common den" and the bedroom she shared with defendant. The record shows that Gregg and Spinner were aware of—and observed—the sensible distinction made between jointly occupied areas of a house and those areas where *sole* occupancy by a co-occupant dictates a stronger expectation of privacy. (See *Young* v. *Superior Court* (1976) 57 Cal.App.3d 883, 887 [129 Cal.Rptr. 422], distinguishing a closed bathroom and bedroom from "the common areas of a house, such as the living room and kitchen.") At no time, insofar as the record discloses, did the officers engage in a warrantless search of those areas Anita had identified as her own.

While there was some conflicting evidence concerning the large box in the den, we accept, as we must, the trial court's resolution of that

conflict (*Keithley, supra*) which supported the trial court's denial of the suppression-of-evidence motion. Deputy Spinner testified that he specifically asked Pamela for permission to open the box in which narcotics paraphernalia was found. She consented. Thus, no suppression of this evidence was required.

## V

### *The Search of the Box in the Bedroom*

The situation presented by the officers' search of the bedroom and the discovery of cocaine in the small wooden box presents a different problem, as it appears that Pamela did *not specifically* consent to Spinner's locating and opening this closed container. As a joint occupant of the bedroom with the defendant, and in his absence, the established rule is that Pamela could consent to search of the commonly occupied space. (*People* v. *Meneley* (1972) 29 Cal.App.3d 41, 46 [105 Cal.Rptr. 432].) The question presented, however, is whether she could validly consent to search of a closed container situated therein.

There are a number of California cases which hold invalid such a consent where the closed container, located in a commonly occupied space, is the *individual* property of the nonpresent co-occupant. (See, *e.g., People* v. *Cruz* (1964) 61 Cal.2d 861 [40 Cal.Rptr. 841, 395 P.2d 889]; *People* v. *Murillo* (1966) 241 Cal.App.2d 173 [50 Cal.Rptr. 290]; *People* v. *Egan* (1967) 250 Cal.App.2d 433 [58 Cal.Rptr. 627]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36 [93 Cal.Rptr. 628] and *In re Scott K.* (1979) 24 Cal.3d 395 [155 Cal.Rptr. 671, 595 P.2d 105].) Thus, in *Cruz, supra*, the co-occupants of an apartment who were present and who told officers they could "look around," did not and could not confer consent for a police search of co-occupant defendant's closed suitcase located in the apartment while he was not present.

Our record does not, however, establish that the officers in the case before us were advised that the small box containing cocaine was solely the property of defendant. On the contrary, Pamela testified that she had told the officers that both boxes were communally owned by defendant and herself. The trial court was entitled to reasonably infer from the evidence that the small wooden box was jointly controlled by Pamela and defendant. ■ It is established law that a "[v]alid consent may come from the sole owner of property or from 'a third party who possessed common authority over or other sufficient relationship to

the premises or effects sought to be inspected.'" (*In re Scott K., supra,* 24 Cal.3d 395, 404.)

The rationale for allowing a joint possessor of personal property authority to consent to search of that property is found in *United States* v. *Matlock* (1974) 415 U.S. 164, 171, footnote 7 [39 L.Ed.2d 242, 250, 94 S.Ct. 988], wherein it was stated that "[c]ommon authority is...not to be implied from the mere property interest a third party has in the property. ...but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have *assumed the risk* that one of their number might permit the common area to be searched." (Italics added.)

In *Matlock*, the court upheld the warrantless search of a diaper bag in the home of defendant's common law spouse—a home he shared. The *Matlock* court placed heavy reliance on *Frazier* v. *Cupp* (1969) 394 U.S. 731, 740 [22 L.Ed.2d 684, 693, 89 S.Ct. 1420], which approved the consent search (by one joint possessor) of a duffel bag. Thus we conclude in the case at bench that Pamela, had she been specifically asked by the officers, could have given a valid consent to search the small wooden box in the bedroom—a box which she shared in common with the defendant. We turn to the problem presented by Pamela's lack of *specific* consent.

We have stated that the existence of a valid consent is essentially a factual determination. So too is the *extent* of search authorized by the consent given. (*Cruz, Beach,* all *supra; People* v. *Harwood* (1977) 74 Cal.App.3d 460 [141 Cal.Rptr. 519].) A cogent observation has been made that "police officers may exceed the boundaries of the power conferred on them.... Limitations may exist...in the case of consensual search, by the mutual understanding and reasonable expectations of the parties." (*Harwood, supra,* 74 Cal.App.3d 460, 466-467.)

In the case before us, Deputy Gregg testified that when he asked Pamela if he could search, "[s]he said that she didn't care. I could go ahead and search if I wanted to. She had nothing to hide." Such a general expression could be likened to the consent in *Cruz,* agreeing that the officers could "look around." Without more, it would appear that such a consent could not be construed to include a consent to lifting a wicker basket and opening a small closed container located under it.

■ But the existence of a "consent" and the "scope" of a consent may be determined equally from reasonable *implications* derived from a person's express words and conduct as well as from a person's express words which require no implications. The concept of an officer's "reasonable expectations" is simply that of the "reasonable person" test—the right of a hearer to draw inferences from another's express words and conduct. An *implied* consent to search is as efficacious and effective as an *express* consent to search.

■ Here, the officers' "reasonable expectations" from Pamela's general language had been substantially altered by the fact that Pamela (1) had claimed communal ownership of both boxes and (2) had allowed intrusion into one of them when specifically asked for permission to do so. Under these circumstances, it was reasonable for the officers to draw the inference, when confronted with the second box, that Pamela had impliedly consented to a search of that box. They were not required to reiterate a request for an express consent to open the second box. We conclude, therefore, that the trial court properly denied the suppression-of-evidence motion.

The judgment (order granting probation) is affirmed.

Lillie, J., and Weisz, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.