STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. HARRY D. SUGAR, DEFENDANT-RESPONDENT.

Argued May 5, 1987—Decided July 28, 1987.

*Mark Paul Cronin,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *Mark Paul Cronin* and *Boris Moczula,* Deputy Attorneys General, of counsel and on the brief).

*Jay H. Greenblatt* argued the cause for respondent (*Greenblatt & Riesenburger,* attorneys; *Jay H. Greenblatt* and *Mitchell H. Kizner,* on the brief).

PER CURIAM.

This case has been before this court twice before. On this third appeal we hold that the trial court erred when it suppressed the evidence derived from a search of defendant's property, a search that resulted in the discovery of the victim's body.

I.

On July 10, 1979, Dr. Harry D. Sugar reported the disappearance of his wife, Joan Sugar. On July 31, 1979, Dr. Sugar signed a form consenting to a search of his house and ground by the Vineland police. The search proved fruitless. On August 6, 1979, while Dr. Sugar was in California, Vineland police officers returned to the property and unearthed a shallow grave with the body of Joan Sugar. The body was found under a picnic table close to the house.

The next day, August 7, 1979, Dr. Sugar was arrested as a material witness to her homicide. During questioning, Dr. Sugar requested advice of counsel. The conversations he had with his lawyers were held in private in a room at the police station. Using microphones concealed in the room, Lieutenant Michael Joseph Tirelli, Detective Joseph Leon Soracco, and

Lieutenant Guy Buscemi eavesdropped on and recorded Dr. Sugar's conversation with his lawyer. Detective William Walters and Detective John Mazzeo also heard portions of the conversations. *See State v. Sugar (Sugar* I), 84 *N.J.* 1, 4–7 (1980); *State v. Sugar (Sugar* II), 100 *N.J.* 214, 220–24 (1985).

The Vineland police used the information that was overheard to obtain a search warrant of Dr. Sugar's home. The search conducted in August 1979 uncovered additional evidence corroborating the information overheard and further incriminating Dr. Sugar in the homicide of his wife.

Later, an informant told Dr. Sugar's attorney that his conversation with his client had been bugged. When this disclosure was confirmed, the Attorney General removed the Vineland Police Department and the Cumberland Prosecutor's Office from the case and assumed the investigation and prosecution directly. Appreciating that the surreptitious eavesdropping placed the prosecution in jeopardy, the Attorney General went ahead with the investigation, attempting to rely only on persons and evidence untainted by the illegal surveillance.

Dr. Sugar moved for dismissal of the charges against him on the ground that his constitutional rights had been violated. The trial court granted the motion. This Court reversed. We agreed that defendant's constitutional rights had been violated but concluded that dismissal of the criminal charges was not mandated. Despite the egregious violations of constitutional guarantees involved in the police's conduct,[1] the Court ruled that if the prosecution was "carefully purged of all taint from

---

[1] *See,* e.g., Sugar *I, 84* N.J. *at 12–14:*

We are outraged. We are compelled to say exactly that. ....

Any interference with the intimate relationship between attorney and client may do profound violence to the individual privacy of the client. Instead of receiving the protection that counsel can provide, the client unwittingly reveals his innermost thoughts to the unscrupulous. ....

The fact that the individuals responsible for invading defendant's privacy are law enforcement officials heightens our concern and sparks our sense of outrage.

investigatory excess," it could continue. *Sugar* I, *supra,* 84 *N.J.* at 15. It further held that since the statements overheard did not "amount[ ] to a disclosure of trial strategy," the prosecution would not violate Dr. Sugar's Sixth Amendment rights. *Id.* at 22. The Court also noted that careful use of *voir dire* could eliminate the dangers of prejudicial publicity. *Id.* at 23. To redress the constitutional violations and to remedy the prosecution's misdeeds the Court ordered that tainted witnesses and evidence would be excluded from the grand jury and at trial. *Sugar* I, 84 *N.J.* at 25–26.

The State was able to present the case to the grand jury, gain an indictment, and eventually secure a conviction of Sugar. On appeal, this Court reversed the conviction. We held that the trial court had erred in allowing Detective Mazzeo to be a witness for the State because he participated in and was tainted by the eavesdropping. Excluding him from being a witness was minimally required as a remedy for the official misconduct; it was also required because the defendant would have been effectively precluded from exposing that witness' bias. *Sugar* II, *supra,* 100 *N.J.* at 226–32. We also reversed the trial court's decision to deny defendant's motion to suppress the admission of the victim's body as evidence. The trial court's decision was based on a theory that the search that uncovered this evidence was impliedly consented to by the defendant. However, the evidence for the claim of implied consent came mostly from Mazzeo; because Mazzeo's testimony was inadmissible, the trial court's ruling on admitting the body and derivative forensic test results as evidence was no longer tenable. *Id.* at 233–35. We left open the possibility that even if the search that uncovered the body was illegal, the body could be admitted into evidence under the "inevitable discovery" doctrine. *Id.* at 235–40.

On remand, the trial court held that the State had not produced sufficient competent, admissible evidence that Dr. Sugar had consented unequivocally, intelligently, and voluntarily to the search of his home on August 6. The trial court

further held that the State had not met its burden in proving that the body would inevitably have been discovered. Based on those conclusions, the trial court denied use of the victim's body as evidence. The Appellate Division summarily affirmed the trial court's decision. We reverse. We hold that the State has met its burden in showing that the victim's body inevitably would have been discovered. Because we rule that the trial court should have admitted the body as evidence under the inevitable discovery doctrine, we do not reach the State's contention, accepted by the concurring opinion, that the trial court should have admitted that evidence under a theory of implied consent to the search. We have strong reservations that the search conducted on August 6, 1979, which actually led to the discovery of the body, can be sustained under all of the circumstances as a consensual search. As pointed out in *Sugar II*, consent to a warrantless search not otherwise supported by probable cause or other clear exceptions to the warrant requirement must be shown to be unequivocal, voluntary, knowing, and intelligent. 100 *N.J.* at 233–35.

## II.

The inevitable discovery exception to the exclusionary rule was first elaborated in *Nix v. Williams,* 467 *U.S.* 431, 104 *S.Ct.* 2501, 81 *L.Ed.*2d 377 (1984). Evidence is admissible even though it was the product of an illegal search, "when ... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, [for] there is no nexus sufficient to provide a taint." *Id.* at 448, 104 *S.Ct.* at 2511, 81 *L.Ed.*2d at 390. The Supreme Court ruled that the prosecution had to prove inevitable discovery by a preponderance of the evidence. *Id.* at 444, 104 *S.Ct.* at 2509, 81 *L.Ed.*2d at 387.

In *Sugar* II, we adopted a restrictive formulation of the inevitable discovery doctrine:

We require the State to show that (1) proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of

the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means. [*Sugar* II, *supra*, 100 *N.J.* at 235.]

Also, the State's burden of proof is the "clear and convincing" standard rather than the more lenient federal "preponderance of the evidence" standard. *Id.* at 240.

Recent federal court cases have elaborated and clarified various elements of the inevitable discovery doctrine. Rulings relevant to the present case include the conclusions that the doctrine applies where disputed evidence inevitably would have been discovered by a private party rather than by the police, *e.g.*, *United States v. Hernandez-Cano*, 808 *F.*2d 779 (11th Cir.1987), and that the doctrine applies to direct as well as indirect products of the State's unlawful behavior, *e.g.*, *United States v. Pimental*, 810 *F.*2d 366 (2nd Cir.1987). We think these elaborations are consistent with the holding and reasoning of *Nix v. Williams, see Nix, supra,* 467 *U.S.* at 441–48, 104 *S.Ct.* at 2507–11, 81 *L.Ed.*2d at 386–90, and with our holding in *Sugar* II, and we adopt them.

### III.

The trial court reviewed the evidence regarding inevitable discovery of the victim's body. The body was buried unevenly in shallow ground under a picnic table close to the Sugar house. A number of weeks after burial, the ground where the body was buried would eventually settle showing a marked depression accentuated by an absence of vegetation. These changes would be readily visible to even a casual observer. The body would have given off a detectable odor that would be noticeable by persons and would strongly attract animals and insects. An expert also testified that had the body been discovered by early November 1979, the State would have been able to prove the presence of poison in the body.

In addition to these facts, the State adduced evidence stressing that Dr. Sugar, having agreed in early July to sell the house and property to the Calliaris, would have transferred the property to the buyers. The State argued that the body would then have been inevitably discovered. The Calliaris testified that if they were on the property, they would have come across the body in the course of working in the yard, as well as from the likelihood of their dog digging at the site of the buried body.

The sale had not yet been executed nor had title passed by the time the body was discovered on Dr. Sugar's property. Without Mrs. Sugar being able to co-sign the deed documents, the sale could have been completed only if Dr. Sugar had, with the Calliaris, petitioned a court to except the sale of the premises from Mrs. Sugar's dower right.

Relying primarily on the evidence relating to the sale of the property, the trial court determined that the evidence indicating that the victim's body would inevitably have been discovered did not rise to the level of proof required of the State in this case. The trial court then concluded that the State had not met its burden under the test established by *Sugar* II: "the State has failed to produce any reliable evidence from which this court can clearly and convincingly conclude when and under what precise circumstances the body would have been inevitably discovered."

The trial court's standard, that the State must show "when and under what precise circumstances" the discovery would occur, misconstrues the inevitable discovery standard. The standard as articulated by the trial court does not comport with our decision in *Sugar* II and finds no support in *Nix* and the subsequent federal court cases. To establish the inevitability of discovery of evidence, the State need not demonstrate the exact circumstances of the evidence's discovery. It need not establish the exclusive path leading to the discovery. It need only present facts sufficient to persuade the court, by a clear and convincing standard, that the body would be discovered. It

may do this by demonstrating that such discovery would occur in one or in several ways. A number of possibilities may cumulatively constitute clear and convincing evidence that the evidence would be discovered. The State need only present facts or elements—proving each such fact or element by a preponderance of the evidence—that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered. *See State v. Brown*, 80 *N.J.* 587, 592 (1979) (the jury's subsidiary inferences need not be established by the same strict standards required for its ultimate finding); *see also* Nesson, "The Evidence or the Event," 98 *Harv.L.Rev.* 1357, 1388–90 (1985) (in the jury determination of the most persuasive legal-narrative in a case, the "narrative need only present the most believable account of each constituent element of the story").

The trial court's misperception of the legal standard governing the inevitable discovery doctrine may have contributed to an unduly narrow consideration and erroneous legal assessment of all the evidence presented. The usual procedure at this point would be for the Court to remand this case to the trial court for it to redetermine the matter under the correct, clarified standard. *See, e.g., State v. Roth*, 95 *N.J.* 334 (1984). However, we do not perceive this case as a usual case. This is a murder prosecution, which has been delayed while important constitutional and legal issues were considered by this Court on three separate sets of appeals.[2] The trial court would be justified in thinking that the time and effort necessary to retry the suppression motion will not overcome the continuing risk of reversal and added delay. Moreover, the evidence presented does not pose issues of credibility or require the subjective and intuitive evaluations of a trial court that would otherwise

---

[2]The delay, the novelty of the issues, and the need for continual reclarification may be partly our own fault. In hindsight, while encouraging the trial court on remand to exercise its full discretionary responsibilities, our instructions may not have been as comprehensive or clear as they ought to have been.

dictate a remand for a reconsideration at the trial level. In these extraordinary circumstances, we believe it appropriate to invoke our original jurisdiction, *R.* 2:10-5, "as [it] is necessary to the complete determination of [the] matter on review"—the issue of inevitable discovery. *See State v. Ashby,* 43 *N.J.* 273 (1964).

## IV.

■ As noted, the trial court focused on the evidence relating to the sale of Dr. Sugar's house as the asserted basis for inevitable discovery. The court concluded that if the sale of Dr. Sugar's property to the Calliaris would not have occurred, the victim's body would not have been discovered. This conclusion was based largely on the premise that Dr. Sugar's cooperation was necessary, and the assumption that such cooperation would not have been forthcoming. The trial court believed that Dr. Sugar would not make any effort to sell the property, given the greater risk that the victim's body would then be discovered.

In reaching this conclusion, the trial court considered but one possibility disregarding other possibilities of inevitable discovery. Moreover, the trial court predicated its rejection of the possible sale of the property solely upon motives and strategies imputed to Dr. Sugar that are belied by his actual deeds. The determination that Dr. Sugar would not be cooperative was unsupported. There is no evidence of hesitancy on Dr. Sugar's part regarding the sale of his land. For example, evidence given at the suppression hearing shows that he had reduced his asking price substantially to sell the property at the price the Calliaris were offering. There is no evidence on record that the delay pursuant to the court petition required would have been other than normal.[3] Indeed, the facts point in a different

---

[3]The trial court based its legal conclusion in part on the fact that delay would have doomed the sale because of the Calliaris' mortgage commitment time limitation. However, Carl Calliari testified that he did not need a mortgage because he would have sold his own house, which he owned "free

direction. Dr. Sugar acted in ways that showed a strong disregard for the risk of the body's discovery. At least once he expressly consented to a police search of his property; he professed ongoing cooperation and assistance with the police; and he acquiesced in the continuing presence of the police—and others—on his property. Further, the trial court's reliance on the possibility that Dr. Sugar could have removed the body, to support its conclusion that the body would not have been discovered, was error. *See Segura v. United States,* 468 *U.S.* 796, 104 *S.Ct.* 3380, 82 *L.Ed.*2d 599 (1984) (applying the analogous independent source exception to the exclusionary rule; concluding that courts should not consider the possibility that the defendants could have destroyed the evidence in question had it not been found earlier).

Moreover, even within the framework of the State's express theory—that the Sugar property would have been sold to a third party—the evidence in the record establishes subsidiary facts, by at least the preponderance of the evidence, that cumulatively support the ultimate determination of inevitable discovery. The ground under which the body was buried would soon begin to appear conspicuously different from surrounding property; it would be obvious to anyone that the site was abnormal, arousing suspicion. And, the Calliaris would have had complete use of the property and planned to dig up this area of the property. Together these facts involving the likely sale of the property create at least a reasonable probability that the Calliaris, as well as other persons would have had access to the land, leading inevitably to the discovery of the body.

Aside from the particular theory emphasized by the State, namely, the sale and transfer of the property by Dr. Sugar, the facts support the conclusion of inevitable discovery. These relate to the defendant's conduct and his actual or professed

and clear." In fact, when the Calliaris did finally purchase the house, they used no mortgage funds.

attitude of cooperation with the police and others that strongly indicate that other persons would have had access to his property.

By stipulation, defendant's testimony at the first suppression hearing was incorporated by reference into the record of the second suppression hearing. Dr. Sugar had testified that from his first contact with the police, he cooperated fully in the investigation. He was in daily contact with the Vineland police and acknowledged that he was being fully cooperative with the police in their efforts to find his wife: " * * * once they asked me something, I cooperated with them." Dr. Sugar provided the police with the names of friends and relatives, access to financial records, a photograph of his wife to be printed in the newspaper and information that a friend had seen a picture resembling his wife in a local newspaper. Dr. Sugar acknowledged that when he provided the police with leads, he anticipated that they would investigate.

By July 31, 1979, Dr. Sugar was aware that the police thought there was a possibility that his wife had been murdered and might be buried on his property and that he was a possible suspect. He nevertheless executed a written "consent to search" form authorizing the complete search of his house and grounds.

Dr. Sugar was present when the property was searched. Thereafter, he never advised the police that he would not continue to cooperate. In fact, subsequent to the July 31 search, Dr. Sugar called the police on August 2 or 3 to advise them that he would be going to California to see his son and leaving a phone number at which he could be reached if needed. Also on August 2 or 3, Dr. Sugar, at the request of the police, brought certain personal items of his wife's to the police station for use by a psychic. At no time did he indicate that third persons would not have access to the property.

The other testimony before the trial court was that of Barbara Meyers Ambrose, Joyce Lowenstern, Bernice Kushner,

and Detective Frederick Taverner. Mrs. Ambrose, a former employee of defendant and a friend of both defendant and his wife, testified that she spoke with defendant before he departed for California and that he told her that he had given the police permission to search his property while he was gone if they so desired. Joyce Lowenstern, a friend of both Dr. Sugar and his wife, testified that Dr. Sugar specifically told her that the police "had free access to his property at any time." Mrs. Kushner, also a friend of defendant and his wife, testified that Dr. Sugar informed her that the police had searched his property and that he had left his phone number in California in the event the police needed him.

In this connection, Detective Taverner testified that when he interviewed Mrs. Ambrose in August 1979, she told him that Dr. Sugar had given the police permission to search his property even after the search of July 31 had been completed. Dr. Sugar also testified about his conversations with Bernice Kushner, Joyce Lowenstern, and Barbara Meyers Ambrose, acknowledging that he conveyed to each of them the clear understanding that he wished the police to do anything possible or necessary to find his wife. While this evidence may fall short of establishing an implied consent to search, it is fully consistent with the conclusion that Dr. Sugar did not secure his property from intrusion, did not restrict access to his property by other persons and continued to be cooperative with the police.

The eventual discovery of the body under all of the circumstances is a conclusion that can be firmly based on the evidence understood in light of ordinary experience and common sense. It is undisputed that the body was loosely and unevenly buried in a shallow grave; it was not well or carefully buried. *Cf. Segura v. United States*, 468 *U.S.* 796, 104 *S.Ct.* 3380, 82 *L.Ed.* 2d 599 (1984) (narcotics hidden in the ceiling). The Sugar property was a residence and the body was placed in the backyard close to the house; it was not in a remote location. *Cf. Nix, supra* (body hidden deep in the woods). Moreover, the

record clearly supports the inference that Dr. Sugar had friends who were not restricted in their access to the property; such persons would have had opportunity to observe the property including the site of the buried body. *Cf. Hernandez-Cano, supra* (inevitable discovery by a private person). In addition to these circumstances, Mrs. Sugar's disappearance had generated a reasonable suspicion of foul play, including the possibility of homicide. Dr. Sugar was a suspect in his wife's murder even before the police misconduct; his actions and property would undoubtedly have continued to be the subject of scrutiny. *Cf. State v. McKnight*, 52 *N.J.* 35, 56–57 (1968) (when police are lawfully within a viewing area, evidence discovered in plain view can be seized without a search warrant). In sum, this congeries of facts clearly and convincingly establishes the inevitable discovery of the body of Mrs. Sugar.

We are satisfied that the admissibility of this evidence will not minimize or denigrate the constitutional interests that are at stake. We recognize that the State should not be able to take advantage of constitutional violations. *See State v. Novembrino*, 105 *N.J.* 95 (1987). It should not be able to secure the prosecutorial benefit that could have been realized only by the police misconduct that initially required the suppression of evidence. In this case the major constitutional violation, the impermissible eavesdropping, which occurred *after* the discovery of the body, has already been redressed through the application of the exclusionary rule to the tainted witnesses and evidence. *See Sugar* I, *supra; Sugar* II, *supra.* It need not be stretched further.

[The rationale of the exclusionary rule is that] the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

By contrast, the derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct.... The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. [*Nix, supra,* 467 *U.S.* at 433, 104 *S.Ct.* at 2504, 81 *L.Ed.*2d at 387.]

*See Hernandez-Cano, supra,* 808 *F.*2d at 784: "If we declined to extend the inevitable discovery exception to Fleck's search [inevitable discovery by a private party], we would put the government in a worse position than it would have been [had the police misconduct not occurred] "; *see also Sugar* II, *supra,* 100 *N.J.* at 237 ("If the evidence would have been obtained lawfully and properly without the misconduct, exclusion of the evidence would put the prosecution in a worse position than if no illegality had transpired"); *Wicker v. McCotter,* 783 *F.*2d 487, 497 (5th Cir.1986) (evidence admissible because if suspect had not directed police to the location of the murder victim's body, it "would inevitably have been discovered by law enforcement officers or private citizens").

In this case, admission of the victim's body and the derivative forensic test results as evidence would not be allowing the State to benefit from its constitutional violation. It only ensures that in the application of the remedial exclusionary rule, the State is not put in a worse position than it would have been had no violation occurred.

## V.

In light of the State's showings that Mrs. Sugar's grave would soon become conspicuous and Dr. Sugar would have sold his property to the Calliaris, and the subsidiary showings, including the access Dr. Sugar gave other persons to his property, his continuing cooperation with the police, and the police's continuing surveillance of Dr. Sugar and his property, we conclude that the State has proven by clear and convincing evidence that Mrs. Sugar's body would inevitably have been discovered. We are confident that this conclusion is consistent with remedying the police's constitutional violations without leaving the State worse off than it would have been had no violation occurred.

For the reasons stated above, the case is remanded to the trial court, with orders to admit the victim's body and the

derivative forensic test results as evidence, and for further proceedings consistent with this opinion.

O'HERN and STEIN, JJ., concurring in the result.

The majority opinion sustains the admissibility of the decedent's body into evidence, concluding that the State "has met its burden in showing that the victim's body inevitably would have been discovered." *Ante* at 156. We do not reach the inevitable discovery issue. We conclude, as did the trial court in its initial disposition of defendant's suppression motion, *see State v. Sugar*, 100 *N.J.* 214 (1985) (*Sugar II*), that the search that resulted in the discovery of the victim's body was impliedly consented to by Dr. Sugar.

## I

It is undisputed that a consensual search constitutes an exception to the probable cause and warrant requirements of the fourth amendment:

> It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is "per se unreasonable * * * subject only to a few specifically established and well delineated exceptions." It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. [*Schneckloth v. Bustamonte*, 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973) (citations omitted).]

In *State v. Johnson*, 68 *N.J.* 349 (1975), we modified the United States Supreme Court's holding in *Schneckloth* by adopting the added requirement under our state constitution that the State may justify a warrantless search on the basis of consent provided that it "demonstrates knowledge on the part of the person involved that he had a choice in the matter." *Id.* at 354. Subject to that qualification, a search conducted after a voluntary consent is clearly valid. *See State v. King*, 44 *N.J.* 346 (1965).

It is well recognized that a consent sufficient to avoid the necessity of a warrant may be express or implied from the circumstances. *See People v. Engel*, 105 *Cal.App.*3d 489, 504,

164 *Cal.Rptr.* 454, 463 (1980) ("[T]he existence of a 'consent' and the 'scope' of a consent may be determined equally from reasonable *implications* derived from a person's express words and conduct as well as from a person's express words which require no implications. * * * An *implied* consent to search is as efficacious and effective as an *express* consent to search."); *Steigler v. State*, 277 *A.*2d 662, 667 (Del.1971) ("We think that appellant's actions amounted to an implied consent to the search and seizure. One can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim, rather than the perpetrator, of a crime."), *judgment vacated on other grounds*, 408 *U.S.* 939, 92 *S.Ct.* 2872, 33 *L.Ed.* 2d 760 (1972); *State v. Fredette*, 411 *A.*2d 65, 68 (Me.1979) ("The State carries the burden of demonstrating by a preponderance of the evidence that an objective manifestation of consent was given by word or gesture by one bearing an appropriate relationship to the property searched.") (citations omitted); *cf. Thompson v. McManus*, 512 *F.*2d 769, 771 (8th Cir.1975) (aggrieved husband's objective manifestations of consent were sufficient to imply consent to a second search of his residence), *cert.* denied, 421 *U.S.* 1014, 95 *S.Ct.* 2421, 44 *L.Ed.* 2d 683 (1975); *Lewis v. State*, 285 *Md.* 705, 717–21, 404 *A.*2d 1073, 1080–81 (1979) ("[I]n the instant case we have more than simple acquiescence to the police officer's claim that it was necessary to search the house. The defendant had indicated a purpose of cooperating with the police and then affirmatively made arrangements for the police to obtain a house key during his absence."); *Kelly v. State*, 75 *Wis.*2d 303, 313, 249 *N.W.*2d 800, 805 (1977) ("In the case before us the presence of the officers was by the implied consent of the defendant, not only to help the victim but to investigate."); W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 8.2(1), at 219 (2d ed. 1987) (describing cases where consent was recognized "notwithstanding the fact that the person allegedly consenting has never explicitly stated that he is willing to allow the

authorities to search his person, premises or effects. * * * Sometimes the consent is implied from the fact that the person in question has elected to engage in a certain form of activity on a continuing basis.").

In its opinion granting defendant's motion to suppress the victim's body, the trial court imposed an extremely restrictive standard for evaluating whether the search of defendant's property had been consented to. The court stated that

> there was no evidence produced at this hearing to indicate the precise circumstances under which defendant gave the police the permission established by Mrs. Kushner and Mrs. Meyers Ambrose. The State has failed to demonstrate that defendant consented in the manner and to the extent required by the authorities previously cited. *State v. Johnson, supra; State v. King, supra.* To whom did he give such permission? What were the circumstances under which he did so? Was he made aware of the consequences? * * * Hence, the State has failed to produce the necessary "clear and positive evidence" that defendant orally consented to the search.

Preliminarily, we observe that the standard most recently applied by the trial court in determining whether or not the search of defendant's property was consensual differs from the standard that had been applied by the trial court at the conclusion of the earlier suppression hearing. There, the trial court assessed the evidence and determined that there had been an implied consent to the search, a determination that was reversed because it relied in part on the tainted testimony of Detective Mazzeo. As the majority opinion observes, it may well be that in our opinion in *Sugar II, supra,* "while encouraging the trial court on remand to exercise its full discretionary responsibilities, our instructions may not have been as comprehensive or clear as they ought to have been." *Ante* at 159 n. 2. Nevertheless, we do not believe that the Court's holding in *Sugar II* required a change in the standard that determines the existence of implied consent.

In any event, we are satisfied that the trial court has applied an incorrect standard for assessing whether the police search was consensual. We disagree that the State's burden must be to prove either the precise circumstances under which defend-

ant expressed his consent to the police or the specific individual or individuals to whom such express consent was communicated. The fact that the consent may be either express or implied from all of the attendant circumstances requires a thorough review of the entire record to determine whether the testimony and exhibits support the State's contention that defendant impliedly consented to the August Sixth search.[1]

The record of the second suppression hearing incorporated by reference defendant's testimony at the first suppression hearing. Dr. Sugar testified that his first contact with the police occurred when they called him at his office on July 10, 1979, to notify him that they had found his wife's car on a nearby street. The next day he voluntarily went to the Vineland police station and filled out a missing person's report, assisted by Patrolman Austino. He testified that after that time he was in daily contact with the Vineland police. As noted by the majority opinion, Dr. Sugar admitted to

being fully cooperative with the police in their efforts to find his wife: " * * * once they asked me something, I cooperated with them." Dr. Sugar provided the police with the names of friends and relatives, access to financial records, a photograph of his wife to be printed in the newspaper, and information that a friend had seen a picture resembling his wife in a local newspaper. Dr. Sugar acknowledged that when he provided the police with leads, he anticipated that they would investigate. [*Ante* at 162.]

Dr. Sugar also testified that because of his wife's affinity for casinos, he made at least one trip to Atlantic City, purportedly to locate her.

Defendant testified that he conferred with Detective Mazzeo and Lieutenant Tirelli at police headquarters on July 31, 1979, and was asked if the police could search his house and property. Dr. Sugar acknowledged his awareness that he was a possible suspect and that the police thought there was a possibility that

---

[1] We are in accord with the majority's conclusion that a further remand is inappropriate, and that pursuant to *R.* 2:10-5 we should invoke our original jurisdiction to determine the admissibility into evidence of the victim's body. *Ante* at 159-160.

his wife might be buried on his property. Nevertheless, he executed a written "consent to search" form authorizing the City of Vineland Police Department "to conduct the complete search of my house and grounds located at 391 West Walnut Street, Vineland, New Jersey." The consent form recited that Dr. Sugar had the right to refuse consent or to stop the search at any time. Defendant testified that he read the form and understood it "as best as I could at the time."

The initial search occurred on July Thirty-first and lasted for several hours. Dr. Sugar testified that he was never asked to consent to an additional search of his property. He said that after the July Thirty-first search, he did not want the police on his property and that "there was a point in time when I didn't feel that they should—I did not feel comfortable for some reason to have them come on my property." However, he acknowledged that he did not convey that change in attitude to anyone. When asked if there was any way that "the police would know anything more than Harry Sugar wants to cooperate and wants us to do everything we can to find his wife," he responded, "I don't know."

Subsequent to the July Thirty-first search, Dr. Sugar called the police on August Second or Third to advise them that he would be going to California to see his son. He left a phone number at which he could be reached if needed. Also on August Second or Third, Dr. Sugar was asked by the Vineland police to bring certain personal items of his wife's to the police station for use by a psychic. The psychic was to assist the police in their efforts to locate Mrs. Sugar. Dr. Sugar testified that he was skeptical about the psychic but that he cooperated by taking the items requested to the police station so that the police could continue to search for the whereabouts of his missing wife.

The majority opinion summarizes the balance of the testimony before the trial court pertinent to the issue of consent:

The other testimony before the trial court was that of Barbara Meyers Ambrose, Joyce Lowenstern, Bernice Kushner, and Detective Frederick Taverner. Mrs. Ambrose, a former employee of defendant and a friend of both defendant and his wife, testified that she spoke with defendant before he departed for California and that he told her that he had given the police permission to search his property while he was gone if they so desired. Joyce Lowenstern, a friend of both Dr. Sugar and his wife, testified that Dr. Sugar specifically told her that the police "had free access to his property at any time." Mrs. Kushner, also a friend of defendant and his wife, testified that Dr. Sugar informed her that the police had searched his property and that he had left his phone number in California in the event the police needed him.

In this connection, Detective Taverner testified that when he interviewed Mrs. Ambrose in August 1979, she told him that Dr. Sugar had given the police permission to search his property even after the search of July 31 had been completed. Dr. Sugar also testified about his conversations with Bernice Kushner, Joyce Lowenstern, and Barbara Meyers Ambrose, acknowledging that he conveyed to each of them the clear understanding that he wished the police to do anything possible or necessary to find his wife. [*Ante* at 163.]

The trial court, noting the testimony of Barbara Meyers Ambrose, specifically observed that

it is true that her testimony was vague and inconsistent regarding the exact date and time when defendant told her before he left for California. Nevertheless, it is clear defendant did make such a statement before he left for California, not only to Mrs. Lowenstern and Mrs. Kushner but also to Mrs. Meyers Ambrose.

We also note that the police search on August Sixth involved only the area near the picnic table in the rear yard of defendant's house. No entry of defendant's home occurred on that date. It has often been noted that "physical entry of the home is the chief evil against which the wording of the fourth amendment is directed." *United States v. United States District Court*, 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972); *see also State v. Bruzzese*, 94 *N.J.* 210, 217 (1983) ("Historically, the Court has applied a more stringent standard of the fourth amendment to searches of a residential dwelling."), *cert.* denied, 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.* 2d 695 (1984). Although the United States Supreme Court in *Oliver v. United States*, 466 *U.S.* 170, 104 *S.Ct.* 1735, 80 *L.Ed.* 2d 214 (1984), held that there was no fourth amendment privacy interest in open fields, the Court observed that the "curtilage," the land immediately surrounding the home, is entitled to

fourth amendment protections that attach to the home. *Id.* at 180, 104 *S.Ct.* at 1735, 1742, 80 *L.Ed.*2d 214, 225. The Court in *Oliver* declined to elaborate on "the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself," *id.* at 180 n. 11, 104 *S.Ct.* 1742 n. 11, 80 *L.Ed.*2d at 225 n. 11. Nevertheless, it has been recognized that there is a lesser privacy interest in the curtilage than in the interior of a residence. *See Keyes v. City of Albany,* 594 *F.Supp.* 1147, 1153–54 (N.D.N.Y.1984); *cf. California v. Ciraolo,* 476 *U.S.* 207, —, 106 *S.Ct.* 1809, 1812, 90 *L.Ed.*2d 210, 216 (1986) ("That the area is within the curtilage does not itself bar all police observation."). Whether a lesser privacy interest or not, under these circumstances the renewed search of Dr. Sugar's yard was clearly consistent with the continuing duty of the police to locate the apparently missing person of Joan Sugar.

In the context of all of the surrounding circumstances, we are convinced that the Vineland police officers acted reasonably in concluding that defendant had impliedly consented to a second search of his backyard. Concededly, by July 31, 1979, defendant was a suspect and had been so advised by the Vineland police. However, there had as yet been uncovered no evidence of defendant's involvement in his wife's disappearance. The cooperation with the investigative efforts of the police that defendant had manifested from the time of his wife's disappearance had continued unabated. Significantly, when confronted with *Miranda* warnings and an expression by the police that he was a possible suspect, defendant expressly consented to a search of his house and property on July Thirty-first, and continued to communicate and cooperate with the police until his departure for California. His delivery of personal articles belonging to his wife for use by the psychic further evidenced his cooperation and his knowledge that the police were continuing to search for his wife.

The Vineland police were confronted with the ambiguous conduct of a possible suspect who maintained his innocence and

persisted in soliciting police efforts to investigate and solve his wife's disappearance. Whether or not the police officers suspected that defendant's cooperative demeanor was a ruse, the police officers' responsibility was to pursue the investigation into the disappearance of defendant's wife. This responsibility led them to return to defendant's property on August Sixth to reexamine the fresh dirt under the picnic table, leading to discovery of defendant's wife buried in a shallow grave. If in fact the police misconstrued defendant's manifestations of apparent cooperation, believing that their return to his property was authorized, it would be anomalous to allow defendant to be the beneficiary of his ambiguous behavior. *Cf. State v. McKnight*, 52 *N.J.* 35, 52 (1968):

> [A]s to the culprit who reveals his guilt unwittingly * * * it is no more unfair to use the evidence he thereby reveals than it is to turn against him the clues at the scene of the crime which a brighter, better informed, or more gifted criminal would not have left.

Based on all of the events and circumstances that had occurred since Mrs. Sugar's disappearance in early July—including defendant's filing of a missing persons report, his unabated communication and cooperation with the local police, his personal efforts to locate his wife (including at least one trip to Atlantic City to search for her), his voluntary authorization permitting a search of his house and grounds, his delivery of financial records, photographs, names of friends and relatives, clothes as requested by the psychic working with the Vineland police—we find that the police were warranted in concluding that their return to defendant's property on August Sixth was impliedly authorized by defendant and did not require a search warrant. As the Supreme Court of Delaware observed in *Steigler v. State, supra,*

> [i]n view of appellant's apparent earnestness in assisting the police in every way, their failure to obtain a search warrant is understandable.
>
> At that time, the house was not fit for human habitation and, as appellant knew, the police were in possession of it and were making a very careful search for anything that might shed light on the identity of the culprit. Obviously, the

appellant appeared fully cooperative with the officers. At that time these officers had no facts upon which to base a definite belief or suspicion of the appellant. We think that appellant's actions amounted to an implied consent to the search and seizure. One can hardly expect the police to get a search warrant for a house or building when the owner is obviously cooperative and gives every appearance of being the victim, rather than the perpetrator, of a crime. [277 *A.*2d at 667.]

Accordingly, we conclude that since the search of defendant's yard on August 6, 1979, was impliedly consented to by defendant, the victim's body and the derivative forensic test results should be admitted into evidence. We emphasize that our conclusion that the second search of defendant's property was impliedly authorized is based on the unique circumstances of this case and particularly on the defendant's unabated and unqualified cooperation with police efforts to find his wife.

The constitutional requirement of probable cause that is the linchpin of the fourth amendment's protection against unreasonable searches, *see State v. Novembrino,* 105 *N.J.* 95 (1987), is not directly implicated when a search is found to be consensual. The issue of consent, an exception to the constitutional requirement, is basically factual, to be determined in the context of all the relevant circumstances. In our view, the admissibility of this evidence does not compromise the constitutional principles that govern nonconsensual searches.

Accordingly, although we concur in the judgment of the Court, we do so on the ground that defendant had impliedly consented to the search of his property on August 6, 1979.

O'HERN and STEIN, JJ., concurring in the result.

*For remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.