270 N.J. Super. 252 (1990)
636 A.2d 1097
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN EMIL LIST, DEFENDANT.
Superior Court of New Jersey, Law Division Union County.
Decided March 29, 1990.
*254 Eleanor Clark and Brian D. Gillet, Assistant Prosecutors, for the State (John H. Stamler, Union County Prosecutor, attorney).
Elijah L. Miller, Deputy Public Defender, for defendant (Wilfredo Caraballo, Public Defender, attorney).
WERTHEIMER, J.S.C.
This matter comes before the court on defendant's motion to suppress all evidence seized as a result of a warrantless search that took place at the defendant's house on December 7, 1971. Defendant stands before this court on a five count indictment which alleges that he murdered his wife, his mother and his three children on November 9, 1971. Defendant remained at large for some seventeen and a half years thereafter until he was located and arrested in the spring of 1989 after a tip which followed a television show's account of the alleged crime.
The facts submitted by the State and the defense in their briefs concerning this motion are divergent but not in any significant aspect. Defendant contends that five people witnessed the initial entry into the List home on December 7, 1971. The Westfield Police were called to the house after family friends expressed concern for the Lists, especially defendant's elderly mother who lived on the third floor, because no one had been seen around the house for at least three weeks. One of the family acquaintances, Edwin Illiano, claims he was the first to enter the house, albeit in the presence of the police. During this entry, which was made through a window Illiano claims to have opened, Illiano came across "four (4) human figures laying on the floor" of the house's ballroom. He yelled, "Patti," the name of the Lists' only daughter and his drama club colleague, and as an "eerie feeling" came over him he exited the open window. He says then the police entered the house for the first time.
The State's version differs from the above. At approximately 4:30 p.m. on December 7 the Westfield Police Department received a telephone call at headquarters from Illiano and Barbara *255 Sheridan expressing concern about Patricia List, who was a member of their drama group, and who had been neither seen nor heard for three to four weeks. At approximately 7:30 p.m., Captain Vardalis of the Westfield Police Department telephoned Dr. William Cunnick, a neighbor of the Lists, who indicated he had not seen the family for a while and who expressed concern for defendant's elderly mother who lived on the third floor. Cunnick noted that the List dog had not been seen and that light bulbs in the house were burning out but were not being replaced.
The Westfield Police Department responded to the home at approximately 9:30 p.m. after Mrs. Cunnick advised that a white Pontiac, which had been seen at the house on various recent occasions, had returned to the List driveway. When the officers arrived they discovered Sheridan and Illiano were the car's occupants and that Cunnick was also on the property. All three people expressed concerns for the family. After speaking to them, Police Officer George Zhelesnik went to the house, found an unlatched window adjoining the porch and entered the dining room. Zhelesnik's partner, Charles Haller, followed him inside and shortly Sheridan and Illiano followed.
Testimony at the motion to suppress has amplified the positions of the parties as the record more fully reveals. Dovetailing the parties' positions in their briefs with this testimony the court makes the following findings of fact.
During the evening of December 7, 1971, after a meeting with Sheridan, Illiano and Cunnick, Westfield Police Officers entered the List home without a search warrant. The court finds Illiano's protestations to the contrary not to be credible. The court finds his testimony substantially divergent from that of so many other credible witnesses that it rejects it in all significant details.
This court is not saying that Illiano purposely fabricated his testimony but rather that his memory has played tricks on him after eighteen and a half years. His account is too frequently contradicted by more than just one other witness and too easily rebuttable to be believable. His testimony as to who entered the *256 home first is belied by Zhelesnik and Sheridan; there was no vinyl door to the ballroom as he believes, as testified by the police and confirmed by photographs S-89 and S-90; the house was completely dark on the first floor, as confirmed by Zhelesnik, Sheridan and the Cunnicks, as the lights had burned out over the time the house was vacant; therefore, a flashlight was needed for vision as the police and Sheridan testified. Sheridan contradicted her friend in many important respects and even Illiano testified that she has "an unbelievable mind and is a very rational person." More importantly, his sworn statement to the police the very night in question disputes his testimony here. Perhaps Illiano's penchant for drama has innocently intruded on his memory over the years.
When Zhelesnik did enter the house, it was cold, and music could be heard through a central intercom system. There was a faint offensive odor. The officers entered a pantry and observed what appeared to be dried blood on the floor. Subsequently Illiano led the officers into the living room and opened a large drape which led into a ballroom. Zhelesnik shined his flashlight into the darkened room and thereby discovered four bodies with their faces hidden from view. Closer examination revealed the bodies were dead.
Thereafter, more police were summoned to the scene and the house was searched. As a result, a fifth cadaver was located on the third floor and a series of notes, letters and directions were found in the den. Two notes were found on the desk in the den; while one read "Guns and ammo", the other notably read: "To the finder  1. Please contact the proper authorities. 2. The key to this desk is in an envelope addressed to myself.  Printed. 3. The keys to the files are on the desk." The note was signed "J. List."
Five other notes were attached to the face of the drawers on two file cabinets. The notes read: "For Burt Goldstein; For Pastor Rehwinkel, Burton Goldstein and administrators; For Burt Goldstein; Bills and insurance policies; For Burt Goldstein of State Mutual of America. (Exhibit E-1 of the State's brief.) The *257 file cabinets were opened by keys found in the desk. The desk had been forcibly entered by the police. Defendant is moving to suppress everything that was seized in the house as an unreasonable, warrantless search and seizure violative of the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.
Subsequent investigations disclosed many more evidential items, but for the purposes of this opinion the court finds the following to be the most significant. There were two mortgages on defendant's house with the First Federal Savings and Loan to which no payment was made after November 1, 1971. Defendant's car was not found at his house but subsequently it was located at Kennedy Airport, and inside it a parking voucher was found dated November 10th. There were seven other identifications or registration cards with defendant's name on them also found in the car, as were the keys. Records from two checking accounts at Suburban Trust Company revealed the last activity on each to have been November 10th and 19th, 1971, respectively. Defendant last accessed a safe deposit box on November 9, 1971, at 1:37 p.m. While the notes found in the cabinets may speak for themselves, the compelling conclusion of their import is that they were in the form of "goodbyes" and instructions to others to wind up the affairs of the List family.
Defendant was subsequently arrested in 1989. At the time of his arrest and subsequent processing he carried a Social Security Card in the name of Robert P. Clark, an alias he has admitted using. Investigation revealed that the card had been applied for on November 22, 1971, by an individual purporting to be Robert P. Clark in Denver, Colorado. Denver was a town in which defendant sought employment the following year as an accountant, which, parenthetically, was defendant's chosen field of endeavor as John E. List.
The highest court in our land has long and consistently held that the privacy and personal security rights which the Fourth Amendment protects "are to be regarded as the very *258 essence of constitutional liberty." Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921). These rights are so sacred that "a warrantless search is presumed to be invalid. Hence, the State must prove the overall reasonableness and validity of the search." State v. Valencia, 93 N.J. 126, 133, 459 A.2d 1149 (1983). This concept of "reasonableness" is the polestar for this court's inquiry and analysis, as not all searches are proscribed by the Fourth Amendment, rather, only those that are judicially deemed unreasonable. State v. Bruzzese, 94 N.J. 210, 217, 463 A.2d 320 (1983). The court enters this exercise with full knowledge that the New Jersey "Supreme Court has made clear its intention to afford persons in this state greater protection against unreasonable searches and seizures than afforded by the United States Supreme Court's interpretation of the Fourth Amendment." State v. Novembrino, 200 N.J. Super. 229, 240, 491 A.2d 37 (App.Div. 1985), aff'd. 105 N.J. 95, 519 A.2d 820 (1987).
The defense posits that the State should have sought a search warrant before it, or its agents, entered the house, and suggests (based upon what was known before the entry) a search warrant probably could not have been obtained. Defendant also states that once State agents were inside and the bodies were discovered, the State should have sought a search warrant to enter the desk and file cabinets.
It is the State's position that the search in question, and subsequent seizures, were justified under three recognized legal principles: abandonment, inevitable discovery and the State's community caretaking function.
As noted above, the Fourth Amendment protects privacy rights, but it does not protect abandoned property because there is no reasonable expectation of privacy in property that has been abandoned. United States v. Jones, 707 F.2d 1169, 1172 (10th Cir.), cert. denied, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983); State v. Farinich, 179 N.J. Super. 1, 6, 430 A.2d 233 (App.Div. 1981), aff'd. 89 N.J. 378, 446 A.2d 120 (1982). "Abandon" in the legal sense has been historically defined: "To desert, surrender, foresake or cede. To relinquish or give up the intent *259 of never again resuming one's right or interest." Black's Law Dictionary, (4th ed. 1951). This concept has been adopted and implemented in New Jersey through the decision in State v. Farinich, ibid, which noted that the issue of whether property has been abandoned is factual in nature. The question is whether after taking defendant's actions into account he can any longer retain a reasonable expectation of privacy in the property at the time of the search. Ibid, citing United States v. Colbert, 474 F.2d 174, 176 (5th Cir.1973).
This court concludes that John Emil List did not, and could not, possess such a reasonable expectation of privacy in his house or its contents so as to require the Westfield Police to obtain a search warrant before they entered his home. Three days after the house was entered his car was found at the long term parking lot at Kennedy Airport. It had been there since November 10. Thus defendant had not returned home for 27 days. But no fact is more significant to this court's conclusion than the one that defendant remained at large under an alias for seventeen and a half years without evidencing any acts, words or intent to claim what he left behind. Anyone who doubts his intent to abandon all that he had foresaken need only refer to the factual findings, infra and conjure a mental image of defendant being returned to New Jersey under an assumed name in leg irons and handcuffs. There can be no clearer portrait of a person who has abandoned his past.
However, that is not all. We know from notes which he left that defendant directed the finder of the note which had been placed in plain view on his desk in his den to "please contact the proper authorities." He obviously wanted law enforcement to be contacted, and he, therefore, expressly indicated his expectation that the authorities would someday see and act upon the scenario he left behind. The note is an indication that he at least abandoned the property "to the finder."
Even absent that note, the police action in opening locked desks, drawers and cabinets was permissible. See United States v. Levasseur, 620 F. Supp. 624 (D.C.N.Y. 1985), aff'd., 816 F.2d 37 *260 (2nd Cir.1987). The circuit court noted in that case that evidence which established that defendants had abandoned their house justified the warrantless search of a locked footlocker. The circuit court also held: "(t)he facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure. Rather, subsequently discovered events may support an inference that appellants had already chosen, and manifested their decision, not to return to the property." United States v. Levasseur, supra, 816 F.2d at 44. United States v. Moskowitz, 883 F.2d 1142, 1148 (2nd Cir.1989), held:
As we have said ... [t]his is so because the issue here is not the subjective state of mind of [the police officer] as he conducted the search. Rather, the issue is whether [defendant] had manifested an intent to abandon his luggage....
This defendant not only abandoned his house and all of its contents, but he also abandoned his car, his credentials, his bank accounts, his mortgage obligations and his name. At the time defendant was apprehended he was using an alias and very obviously had foresaken and abandoned his past life as John Emil List. While this Court holds that the evidence presented to the police on December 7, 1971, inescapably compelled the conclusion that defendant had earlier abandoned his house and contents, the events that followed November 9, 1971, until his arrest last year underscore the validity of this conclusion.
By virtue of the foregoing, it is unnecessary to discuss the other points of the State's brief, but, as all this court does is always subject to appellate review, it wishes the reviewing court to have the benefit of its conclusions concerning the State's positions on inevitable discovery and the community caretaking function.
Under the inevitable discovery doctrine, evidence which is the product of an illegal search is admissible when it would have inevitably been discovered without reference to police error or misconduct. While this doctrine was seminally discussed in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), it has been recognized and accepted in this State in State v. Sugar, 108 N.J. 151, 527 A.2d 1377 (1987). The Sugar case involved the *261 question of the inevitable discovery of defendant's wife's body, which was buried unevenly in shallow ground under a picnic table close to the defendant's house.
It is purely and plainly delusive to argue that but for the police action on December 7 the house would not have been entered and the evidence found. First, as noted by our Supreme Court in Sugar, eventually the five bodies "would have given off a detectable odor that would (have been) noticeable by persons and would strongly attract animals and insects". Id. at 157, 527 A.2d 1377. Family members would have eventually harbored such concern for the wellbeing of their relatives that they would have entered or requested police assistance in entering the house. Friends would have, and as it turned out did, act likewise. There are countless scenarios common to everyday existence that compel the conclusion that the evidence found in the house would have inevitably been brought to the attention of the police. Finally, it would defy all reason, belief, and common experience not to conclude that those who held outstanding mortgages on the List home would not have eventually sought to protect their interest through default, possession and foreclosure. Thus, the foreclosures that defendant feared because of his financial woes are the most certain indicia for the implementation of the inevitable discovery rule.
The State has established, as much as common sense has, facts sufficient for this court to conclude by clear and convincing evidence that the house's contents would have been inevitably discovered by the authorities or others. While the exact circumstances and manner of the discovery is unknowable, the State need not demonstrate that. Id. at 158, 527 A.2d 1377.
Research reveals that courts have usually limited the implementation of the community caretaking doctrine to cases involving searches of automobiles. Once again when discussing the Fourth Amendment, or any exception thereto, the ultimate standard is reasonableness. Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 2031-32, 29 L.Ed.2d 564 (1971); Camara v. Municipal Court, 387 U.S. 523, 528-529, 87 S.Ct. 1727, 1730-31, 18 L.Ed.2d 930 (1967).
*262 The United States Supreme Court discussed both the community caretaking function and the principle that "searches of cars that are constantly movable may make the search ... without a warrant a reasonable one although the result might be the opposite in a search of a home, a store or other fixed piece of property." Cady v. Dombrowski, 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973) (quoting Cooper v. California, 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967)).
The purpose of the doctrine is the protection of the community from the possibility of harm that could befall its members. Cady, supra, 413 U.S. at 443, 93 S.Ct. at 2529. Thus, under appropriate circumstances, police officers are permitted to enter motor vehicles without a warrant to protect innocent citizens who might encounter a potential danger. In Cady, the action deemed permissible was to locate and remove a revolver to protect the public from the possibility it might fall into "untrained or malicious hands." Id. at 444, 93 S.Ct. at 2529. Similarly, inventory searches of impounded vehicles have been permitted without a search warrant in order to (1) protect the owner's property while in police custody; (2) protect the public from claims concerning lost or stolen property; and (3) protect the police from potential danger. South Dakota v. Opperman, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976).
The New Jersey Supreme Court discussed the community caretaking function last May in State v. Hill, 115 N.J. 169, 557 A.2d 322 (1989). In that per curiam decision, the Supreme Court suggested that there must be some evidence that "caretaking is required, e.g. that public safety is jeopardized." Id. at 177, 557 A.2d 322. It further noted that "the `community caretaking' exception has not been applied outside of the `impounded automobile' context." Id. at 178, 557 A.2d 322 (citing United States v. Pichany, 687 F.2d 204, 207-08 (7th Cir.1982)).
It is not the commission of this trial level court to chart unplotted waters for the appellate courts. It is worth noting, *263 however, that circumstances are indeed imaginable which might require entry into a private residence for reasons "totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute", as noted in Cady, supra, 413 U.S. at 441, 93 S.Ct. at 2528, in the automobile context. Indeed, in the case at bar, if the Lists had no friends or neighbors who expressed concern, and no family who undoubtedly eventually would have, it might have fallen on the Westfield Police to enter the premises in order to investigate the family's welfare, wholly apart from and innocent of any indicia of criminality. There could come a time where such action was not only conceivable but also sound police procedure exercised for the general health and welfare. However, because the concept of the sanctity of our homes is such a sacred value to our society and so eloquently engrained in the Federal and State Constitutions it would be truly extraordinary, remarkable and unusual circumstances that would allow such an entry. Because of this Court's ruling on the issues of abandonment and inevitable discovery it is not now necessary to conclude that the entry in this case was thus protected.
For all the foregoing reasons defendant's motion to suppress is denied.